(125 So. 437)

No. 30063.

·FORET v. BOARD OF LEVEE COM'RS OF ORLEANS LEVEE DIST.

Dec. 2, 1929.

L. H. Perez, of New Orleans, for appellant.

Monroe & Lemann, Arthur B. Hammond, James G. Schillin, and William Brewer, all of New Orleans, for appellee.

John R. Perez, St. John Perret, Henry G. McMahon, John H. Holmes, Brian & Brian, Wallace A. Nunez, John C. O'Connor, Bond, Curtis, Hall & Foster, and William H. Talbot, all of New Orleans, amici curiæ.

OVERTON, J. Plaintiff, at the time he filed the claim, forming the basis of this suit, was a resident of the city of New Orleans, and was a resident thereof, prior to the creation of the Caenarvon crevasse, below the city, on April 29, 1927, by proclamation of the

Governor. The crevasse was created for the purpose of saving the city and the territory immediately adjoining it from the disastrous effects of an inundation from threatened breaks in the levees, along the Mississippi river, immediately above New Orleans. When the crevasse was created, plaintiff was general manager of the St. Bernard Motor Company, Inc.—a body corporate—which was transacting business, in the parish of St. Bernard, within the territory inundated by the crevasse. The creation of the crevasse caused the St. Bernard Motor Company, Inc., to discontinue business while the territory in which it was operating was under water. As a consequence, plaintiff's salary as general manager was discontinued during that period, and he filed a claim for it before the reparations commission. The claim filed by him reads as follows:

"I have been general manager of the St. Bernard Motor Co., Inc., since its incorporation in September 1925. My salary was fixed by the Board of Directors at $75 a week as shown by copy of resolution annexed hereto.

"As a result of the Caenarvon Crevasse created April 29, 1927, the St. Bernard Motor Company, Inc., stopped all business operations and discontinued my salary as general manager as shown by resolution of the Board of Directors, copy of which is hereto annexed. From all indications, as a result of the investigation of conditions in St. Bernard and Plaquemines Parishes below Violet, the company will not be able to resume business operations at least until December 1927. Therefore, in accordance with resolution attached my salary will be discontinued at least until that time.

"Therefore, as a result of this crevasse I have suffered a loss of salary for eight months or thirty-five weeks at $75 a week or a total of $2,625."

The board of levee commissioners of the Orleans levee district, the defendant herein, filed an exception of no cause or right of action against the foregoing claim, and the reparations commission sustained the exception. Plaintiff then resorted to the civil district court for the parish of Orleans, as authorized by section 2 of Act No. 2, Ex. Sess. of 1927, by filing a petition in that court, setting forth that the reparations commission had erroneously rejected his claim, and praying for judgment against defendant for the amount thereof and for attorney's fees and interest. The cause of action set forth in the petition adds nothing to the cause of action, disclosed in the claim, filed before the commission. In fact, the substance of the cause of action, disclosed in each, is identically the same. The demand in the district court was met by an exception of no right or cause of action, as was the demand before the reparations commission. This exception was sustained by the district court, as it was before the commission.

The reason why the Governor ordered the levee cut at Caenarvon was because the flood waters of the Mississippi river had risen to an unprecedented height, and the river experts had predicted a stage of 24 feet at New Orleans, which was beyond the capacity of the levees, at that point, to hold, and it was suggested by engineers that the impending danger could be averted by cutting the levee on the east bank of the Mississippi, below New Orleans, at Caenarvon. It was apparent that, if action was to be taken at all, it would have to be taken immediately. There was no time within which to call the Legislature into extraordinary session. The Attorney General advised the Governor that, under the circumstances existing, he had the legal right, in the exercise of the police power of the state, to cut the levee for the purpose of averting the

threatened danger. This opinion was supported by the written opinion of eleven prominent lawyers of the state.

With these opinions before him, the Governor, on April 26, 1927 issued the following proclamation, addressed to the people of the state of Louisiana, to wit:

"An unprecedented flood now holds in its grip the lower Mississippi Valley. Large areas of the State of Louisiana, and the entire City of New Orleans, are seriously threatened.

"The levees of this state are now holding, but the strain to which they will be subject in the next fifteen days seriously aggravates the present danger, and imperatively demands that drastic steps shall be taken to avert the menace.

"The Mississippi River Commission believes that the creation of an artificial break at some appropriate point will reduce the flood waters at New Orleans and for miles above, thus avoiding great loss of life and property. The State Board of Engineers and the engineers of the City of New Orleans and of the Dock Board concur in this view and recommend immediate action.

"Effective relief can be obtained for the City of New Orleans and surrounding territory by taking such action, and their safety assured.

"In the face of this danger, and with the opportunity of averting it effectively, the Governor of the State of Louisiana, charged with the supreme executive authority of the state, is confronted with the necessity of employing the police powers that inhere in the state.

"The Attorney General of the State of Louisiana has advised me in a written opinion that I possess and can, in this great emergency, exercise the police powers of the state; a number of prominent lawyers of this state have also expressed a like opinion in writing.

"I am impressed with the danger, and I am determined to avert it. The people in the affected area will be removed to safety and properly cared for. No lives will be sacrificed. Relief measures have been provided, and will be put into immediate effect. The damage to property resulting from this act will be paid. The faith of the government of the State of Louisiana and City of New Orleans is pledged to this course.

"Therefore, by virtue of the powers invested in me by the Constitution and laws of the State of Louisiana, I, O. H. Simpson, Governor of the State of Louisiana, do hereby declare that a public emergency exists, and, in order to adequately deal with this situation, an artificial break in the levee of the Mississippi is hereby ordered to be created at or near Poydras Plantation in the parish of St. Bernard, Louisiana, at twelve o'clock noon, on Friday April 29th, 1927, which is the place and time recommended to me by the State Engineers, and I hereby commit the execution of this order to the chief of the State Board of Engineers and the Adjutant General of Louisiana.

"In testimony whereof, I have hereunto set my hand and caused the great seal of the state to be affixed hereto, at the City of Baton Rouge, Louisiana, this 26th day of April, 1927.

"[Original signed]  O. H. Simpson,
            "Governor of Louisiana.

"Attest:

   "[Signed]  James J. Bailey,
                "Secretary of State."

The levee was cut or dynamited, under the orders of the Governor, in the manner and at the time designated in his proclamation, and, as a result, large parts of the parishes of St. Bernard and Plaquemines were inundated. These are facts within the general

knowledge of the people of this state, and therefore within the knowledge of the court, and are proper to be considered in passing upon the exception of no cause of action, and, in interpreting the legislation adopted, looking to the making of reparation.

In September, 1927, the Governor called the Legislature into extraordinary session. In the meantime, in anticipation of such action, a reparations commission was informally appointed, a large sum of money was borrowed for the purpose of paying claims, and the committee began the work of considering claims, of allowing, modifying, or rejecting them, and of paying those allowed.

At that session of the Legislature there was passed Act No. 2, which is a joint resolution, proposing an amendment to the Constitution, relative to the payment of reparation claims, in connection with the Caenarvon crevasse. This resolution was adopted, as a constitutional amendment, at the following general election.

The resolution, adopted as a constitutional amendment, in its preamble, recognizes that the crevasse was created by the authority and direction of the Governor of this state, and in the exercise of the police powers of the state, for the purpose of creating an outlet for the waters of the Mississippi river, so as to lower the stage of the river at New Orleans and above that city, and thereby relieve the city and its inhabitants from the menace of flood waters and of preventing loss of life and damage to property. Following this, the resolution also declares, in its preamble, that: "Whereas, it is proper that just compensation should be made for the losses sustained by individuals, firms or corporations within the inundated area as the result of the waters from said artificial break; and whereas, a Reparations Commission has been heretofore constituted composed of nine citizens,

* * *," and then follow the enacting clauses of the resolution. These, so far as pertinent here, are as follows: "Section 1. That the Board of Levee Commissioners of the Orleans Levee District be and it is hereby authorized and directed, out of the funds hereinafter provided for, to pay (a) just compensation for losses sustained by individuals, firms or corporations within the affected area as the result of the encroachment of said waters; and interest thereon at five (5%) per cent. from April 29th, 1927 to date of payment except on subsequently accruing claims in which cases interest shall run as aforesaid from the date of said claim accrued. * * *" The resolution then provides for the filing and determination of reparation claims, the procedure to be had as to such; for resort to the courts, either by the levee board or the claimant, after the commission has passed on the claim; for the recognition and establishment of the reparations commission, already appointed, for the levy of a tax on all taxable property in the city of New Orleans, not to exceed one mill on the dollar in any one year; and, in order to provide funds for the payment of reparation claims and other expenses, to capitalize the tax authorized into bonds, notes, or certificates of indebtedness, at one time or from time to time, and to sell the same; and for the retention, by the treasurer of the state, of a fund, out of the revenues of the levee board, derived from said tax, to provide for the retirement of the bonds at maturity. Act No. 2, Ex. Sess. of 1927, published in the Acts of 1928, on page 4 of the appendix thereto, showing the constitutional amendments, adopted in April, 1928.

The act of creating the crevasse was the act of the state, through the Governor. This was, in effect, recognized in the preamble to the resolution, adopted in April, 1928, by the people, as an amendment to the Constitution,

where it is declared that the crevasse was created by the authority and direction of the Governor, and in the exercise of the police power of the state, and in the body of the resolution, without in the least varying the declaration, contained in the preamble, but rather adhering to it, by providing for reparation, with the foregoing declaration as the moving cause. It is true that the resolution, as a constitutional amendment, makes the Orleans levee district the debtor, and places the burden on property, in the city of New Orleans, of paying the tax to satisfy the debt, but this is because the city was primarily benefited by the artificially created break. The act of creating the crevasse nevertheless remained the act of the state, through its Governor, in the exercise of its police power.

■ The state directly, or through its agencies, the levee boards, has the right to determine the propriety, location, and mode of building levees, and if damages are occasioned others in the exercise of this right, the damages are damnum absque injuria. Bass v. State of Louisiana, 34 La. Ann. 494; Jackson v. United States, 230 U. S. 1, 33 S. Ct. 1011, 57 L. Ed. 1363. As the state may determine the propriety, location, and mode of building levees, it would seem to follow naturally and logically that, if the state saw proper not to construct a levee at a given point, for the purpose of better protecting the public, a loss occasioned to particular individuals by such action would be damnum absque injuria. It would also seem that, in a public emergency, where prompt action appeared to be required, the opening of a levee, to provide an additional outlet for the waters of a river, in order to protect the public from inundation, would not cause liability to the state, though the opening was made by it, in the absence of a statute clearly providing for the making of compensation, but would

be damnum absque injuria, for the rights of the individual, or even of a number of individuals, must yield to the public welfare.

■ If the state had expropriated the right to inundate the lands actually flooded, instead of flooding them without expropriating the right, in seeking an additional outlet for the waters of the Mississippi, it is certain that, under neither the provisions of section 2 of article 1 of the Constitution, prohibiting the taking or damaging of private property for public purposes, without first paying just and adequate compensation, nor under any other provision thereof, including section 6 of article 16, relative to the using or destroying of property for levee purposes, nor under the articles of the Civil Code, relative to expropriating property, nor under any other law of the state, of which we have knowledge, would one, whose salary has been temporarily suspended, be entitled to recover, because his employer's business, in which he was engaged, was located in the area in which the right was expropriated, and therefore temporarily had to cease operations. In such instance, the damages for which compensation would be paid, viewing the claim in its most favorable light, would be confined to damages for the taking or injuring of property, and would not include, or give rise to an action for such consequential damages as those for the loss of a salaried position, or for the temporary suspension of a salary. McMahon and Perrin v. St. Louis Arkansas & Texas Railroad Co., 41 La. Ann. 827, 6 So. 640; Opelousas, Gulf & N. E. Ry. Co. v. St. Landry Cotton Oil Co., 121 La. 796, 46 So. 810. Aside from this, even a tort-feasor—and the state is certainly not one—who damages another, incurs no liability to persons contracting with or employed by the injured person. Sutherland on Damages, vol. 1, p. 127; Anthony v. Slaid, 11 Metc. (Mass.) 290; Cunningham v.

Brown, 18 Vt. 123, 46 Am. Dec. 140; Brink v. Wabash Railroad, 160 Mo. 87, 60 S. W. 1058, 53 L. R. A. 811, 83 Am. St. Rep. 459; Mobile Insurance Co. v. Brame, 95 U. S. 754, 24 L. Ed. 580.

In view of the foregoing, we think that damages should not be allowed, where they would not be by virtue of the exercise of the expropriation laws, or where even a tortfeasor would not have to respond, unless there be a clear expression of the lawmaker, allowing damages beyond that measure. This view is reinforced by the fact that defendant, the Orleans levee district, did not create the opening in the levee, and that, as observed by counsel for defendant, the sole liability of the district for the results of the crevasse is the liability voluntarily assumed for it by the Legislature and people of the state, when they passed and adopted the constitutional amendment cited above. The view, stated above, is further reinforced by the principle applied in Ward v. Board of Levee Commissioners, 152 La. 158, 92 So. 769, reading, to quote from the syllabus: "Where a right of action against a public body exists only by virtue of a special statutory grant, such right of action is limited strictly to the provisions of the statute." The constitutional amendment, granting the right of action against defendant, so far as it is here pertinent, reads: "That the Board of Levee Commissioners of the Orleans Levee District be and it is hereby authorized and directed, out of the funds hereinafter provided for, to pay (a) just compensation for losses sustained by individuals, firms or corporations within the affected area as the result of the encroachment of said waters. * * *" In using these words, the constitutional amendment conveys the idea that just compensation is directed to be paid for damages to what is encroached on by the waters, that is, physical property. This, it may be observed, is in accordance with the Governor's proclamation, in declaring that "the damage to property resulting from this act will be paid." The constitutional amendment does not include within its terms such consequential damages as those occasioned by the temporary discontinuance of one's salary, due to the fact that the corporation, paying the salary, had to discontinue business temporarily on account of the flood.

The judgment is affirmed.